642 F.2d 1221
 206 U.S.App.D.C. 253
 AERONAUTICAL RADIO, INC., et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Broadcasting Cos., Inc., et al., American Telephone
and Telegraph Co., Microwave Communications, Inc.,
Western Union Telegraph Company, Intervenors.
AERONAUTICAL RADIO, INC., and Air Transport Association of
America, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company, Consolidated Rail
Corporation, Microwave Communications, Inc. and
MCI Telecommunications Corp., American
Newspaper Publishers, et al.,
Intervenors.
GENERAL ELECTRIC COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company, Microwave
Communications, Inc., et al., Intervenors.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Broadcasting Company, Inc. & CBS, Inc. & National
Broadcasting Company, Inc., Dow Jones & Co., Inc.,
Intervenors.
 Nos. 77-1333, 77-1521, 77-1544 and 78-1368.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 27, 1979.
Decided June 24, 1980.
As Modified and Opinion on Rehearing Nov. 5, 1980.
Certiorari Denied April 20 and May 4, 1981.
See 101 S.Ct. 1998, 1999, 2059.
 
 Ron M. Landsman, Atty., Dept. of Justice,Washington, D.C., with whom Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., was on the brief for respondent, United States.
 John L. Bartlett, Washington, D.C., with whom Charles R. Cutler, Michael Yourshaw, James E. Landry and William E. Miller, Washington, D.C., were on the brief for petitioners in nos. 77-1333 and 77-1521.
 Joseph M. Kittner, Edward P. Taptich and Lawrence J. Movshin, Washington, D.C., were on the brief for petitioner, General Elec. Co. in no. 77-1544.
 John E. Ingle, Counsel, F.C.C., Washington, D.C., with whom Robert R. Bruce, Gen. Counsel, and David J. Saylor, Deputy Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C. were on the brief for respondent, F.C.C.
 Richard J. Flynn, Joseph B. Tompkins, Jr., William G. Schaefer, David J. Lewis, Jules M. Perlberg, Washington, D.C., and Alfred A. Green, New York City, were on the brief for intervenor, American Tel. & Tel. in nos. 77-1333, 77-1521 and 77-1544.
 Norman P. Leventhal, Joseph De Franco and Howard Monderer, Washington, D.C., were on the brief for intervenor, American Broadcasting Co., Inc., et al. in no. 77-1333.
 Werner K. Hartenberger, Daniel M. Armstrong, Counsel, F.C.C., Washington, D.C., entered appearances for respondent F.C.C.
 Barry Grossman and James F. Ponsoldt, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent United States.
 Michael H. Bader, Kenneth A. Cox, William J. Byrnes, Washington, D.C., and Raymond C. Fay, Chicago, Ill., entered appearances for intervenor Microwave Communications, Inc. in nos. 77-1333, 77-1521 and 77-1544.
 Joel Yohalem, Washington, D.C., entered an appearance for intervenor, Western Union Tel. Co in no. 77-1333.
 Richard M. Rindler and Russell L. Smith, Washington, D.C., entered appearances for intervenor, Consolidated Rail Corp. in no. 77-1521.
 Aloysius B. McCabe, Michael Yourshaw, Washington, D.C., John R. Baskin, Cleveland, Ohio, and Herbert M. Schulkind, Washington, D.C., entered appearances for intervenor, American Newspaper Publishers, et al. in no. 77-1521.
 Before BAZELON, Senior Circuit Judge, and ROBB and WILKEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge ROBB.
 Opinion filed by Circuit Judge WILKEY, dissenting in part.
 ROBB, Circuit Judge:
 
 
 1
 This case comes to us on petitions for review of eight rulings of the Federal Communications Commission[1] dealing with (1) general ratemaking principles and (2) American Telephone and Telegraph Company's (AT&T's) TELPAK offering. In response to the arguments of the parties, we (1) uphold the Commission's selection of fully distributed costs as its primary costing methodology; (2) vacate certain findings of the Commission with regard to specific rates and past rate levels; (3) uphold the Commission's procedures; and (4) dismiss the petitions to review the Commission's acceptance of a tariff filing.
 
 I. BACKGROUND
 
 2
 AT&T provides two major categories of interstate service: public switched message service and private line service. Public switched message service is of two types, long distance message telecommunications service (MTS) and wide area telecommunications service (WATS). Under MTS (the ordinary "long distance" call), the user dials his call or is assisted by an operator and pays for the service on a per-call basis. Under WATS (a variant of MTS) the customer makes direct dialed calls anywhere within a specified service area at a monthly rate. MTS and WATS are essentially monopoly services in which AT&T does not face competition.
 
 
 3
 Private line service is of several types, primarily telephone, telegraph, audio and video program transmission and data transmission services. These services provide the customer with continuous communication between fixed points without the necessity of establishing a new circuit for each message. Unlike MTS and WATS, several specialized carriers compete against AT&T in the private line service market.
 
 A. Docket 14251
 
 4
 By the end of 1960, it appeared to AT&T's larger private line customers that it might be cheaper to construct their own private microwave systems than to pay AT&T's private line rates. To head off this potential diversion of traffic, AT&T, in January 1961, filed tariffs for TELPAK service. Under TELPAK, a customer with substantial requirements for private line service between two points may order that service on a bulk basis, at relatively less expense than if he were to order an equivalent number of channels on an individual basis.[2] As originally filed, TELPAK was of four types A, B, C, and D. These types provided, respectively, twelve, twenty-four, sixty, and two hundred forty voice-grade channels.[3] TELPAK A and B were subsequently eliminated for reasons which do not presently concern us. With regard to TELPAK C and D, the Commission found that they were justified by competition, but ordered further proceedings to determine whether they were compensatory, i. e., would bear their own costs or would be a burden on other customers of the company.[4] Unfortunately, as of 1967 the FCC had not established any ratemaking standards for determining whether a service was compensatory and consequently the FCC closed out Docket 14251 and transferred this issue, as it applied to TELPAK C and D, together with the entire record in Docket 14251, to a new proceeding Docket 16258.
 
 B. Docket 16258
 
 5
 In October 1965 the FCC began an investigation of the rates and services of AT&T in its General Telephone Rate Investigation (Docket 16258). Phase 1-B of that investigation was designed to establish general ratemaking principles.[5] Of particular interest was whether fully distributed costs (FDC) and/or long-run incremental costs (LRIC) should be the appropriate measure of costs for ratemaking purposes.[6]
 
 
 6
 After lengthy hearings on the general issues of ratemaking and costing principles, the Commission initiated a conference among the parties, hoping they could reach a mutual agreement on the issues. These parties agreed to a "Statement of Ratemaking Principles and Factors" but the Commission did not approve this Statement; rather in July 1969, the Commission "noted" it.[7] At the same time, the Commission folded the entire records of Docket 14251 and Phase 1-B of Docket 16258 into a third proceeding begun the prior year to investigate the lawfulness of substantial rate increases for TELPAK C and D Docket 18128.[8]
 
 C. Docket 18128
 
 7
 Docket 18128 was opened in April 1968 to consider, as noted above, the lawfulness of rate increases for TELPAK C and D, which had been filed in March 1968. 12 F.C.C.2d 1028 (1968). Eventually the Commission was to consider in Docket 18128 a number of other matters in addition to Phase 1-B of Docket 16258 (and the attendant record from Docket 14251). These matters consisted of (1) almost all AT&T's other private line tariffs, 13 F.C.C.2d 853, 857 (1968); (2) new private line tariff revisions filed in October 1969, 20 F.C.C.2d 383, 388 (1969); (3) other tariff revisions for private line services filed in December 1971, 33 F.C.C.2d 522, 525 (1972).
 
 
 8
 Hearings in Docket 18128 were concluded in August 1972 and the record closed that December. More than three years later, the Chief, Common Carrier Bureau, on January 19, 1976 issued the Recommended Decision, 41 Fed.Reg. 4320. Following the filing of exceptions to the Recommended Decision, the Commission on October 1, 1976 issued its Final Decision, 61 F.C.C.2d 587, supplemented by its Rulings on Exceptions, issued February 1, 1977, 42 Fed.Reg. 8178.
 
 
 9
 In this Final Decision the Commission held as follows:(1) Fully distributed costs, rather than long-run incremental costs, should be the primary standard by which to judge rate levels for interstate service. 61 F.C.C.2d at 589-90, 633-49. From the seven different FDC methodologies of record, the Commission selected FDC "Method 7" as that primarily to be used. Id. at 668.[9]
 
 
 10
 (2) The Commission prescribed certain guidelines under 47 U.S.C. § 205 (1976) consistent with its adoption of FDC over LRIC. 61 F.C.C.2d at 659-67.
 
 
 11
 (3) The Commission found that the present return levels for the television, audio/radio, private line, telephone, and private line telegraph service categories were unlawful and that "(p)ast return levels for these services are generally . . . found to have been unlawfully low, although in some years the return level of certain services could have been considered to have approached the zone of reasonableness." 61 F.C.C.2d at 590. See id. at 651-52.
 
 
 12
 (4) The Commission held that the rate differentials embodied in TELPAK C and D were unlawful because they were not justified by competitive necessity; accordingly the Commission ordered that TELPAK be eliminated by June 8, 1977. 61 F.C.C.2d at 657-59, 668-69.
 
 
 13
 At this point in our chronology of events, a slight diversion must be made. Concurrently with its proceedings in Docket 18128, the Commission was conducting a separate rulemaking proceeding in Docket 20097, regarding the broad issue of whether resale and sharing of telecommunications services should be required. "Sharing" is a joint use arrangement in which several users collectively use communications services and facilities provided by a carrier, with each user paying according to its proportionate use. "Resale" is a commercial device whereby one entity subscribes to the communications services and facilities of another entity, and then reoffers these services and facilities to the public. See 60 F.C.C.2d 261, 263, 274 (1976). Finding that unlimited sharing and resale were appropriate, the Commission ordered the carriers to publish new tariffs, to be effective June 21, 1977, providing for resale and unlimited sharing of all private line services, including TELPAK. See 64 F.C.C.2d 1003, 1004 (1977).
 
 
 14
 It appeared to AT&T that a requirement of resale and unlimited sharing would destroy the economic viability of the TELPAK bulk rate offering. It was believed that in a resale and unlimited sharing environment, single-channel private line users would enter into joint use arrangements (sharing) or start purchasing resold TELPAK in order to take advantage of the lower bulk rates. This would result in the provision of substantially all voice-grade private line services at the lower TELPAK rates regardless of whether individual users would normally qualify for bulk communications services. AT&T believed that under these conditions the single-channel private line rates developed specifically on the basis of single-channel usage patterns would be meaningless, and as a practical matter would be eliminated.
 
 
 15
 Now we return to the main narrative. On March 23, 1977 AT&T filed, under Transmittal No. 12714, tariff revisions providing for the termination of TELPAK on June 8, 1977. In its letter of transmittal, AT&T noted that this action was consistent with the order in the Final Decision in Docket 18128 that TELPAK be eliminated by June 8, 1977, but was also precipitated by the impact of the rulings providing for sharing and unlimited resale by June 21, 1977. As the Transmittal stated, "It is our (AT&T's) view that Telpak cannot exist in a resale and sharing environment." (J.A. 445) It is noteworthy for purposes of the petitions before us that Transmittal No. 12714 did not include supporting data under Section 61.38 of the Commission's Rules. (47 C.F.R. § 61.38)D. First Order on Reconsideration
 
 
 16
 In an order first announced at an open meeting on June 1, 1977 and adopted on June 6, 1977, the Commission in several respects reconsidered its Final Decision in Docket 18128. 64 F.C.C.2d 971. Of most significance, the Commission revoked its order that TELPAK be eliminated, and ordered that new proceedings be undertaken to determine the lawfulness of that offering. Also, the Commission, in a departure from its Final Decision,[10] considered and declared unlawful the revisions in the following rates and rate elements within the private line service categories: (1) increases in rates for teletypewriter station equipment, effective November 1, 1968; (2) changes in the TELPAK telegraph/telephone equivalency ratio, effective September 1, 1968 and February 1, 1970; and (3) various elements of the rates in the private line telephone, private line telegraph, and TELPAK offerings, effective May 4, 1972. In each instance, the basis of the Commission's decision was that AT&T had failed to meet its burden of proof (which required that it show that the rates were justified), primarily because it had relied on long-run incremental cost studies. 64 F.C.C.2d at 989-91.
 
 E. Petitions to Reject
 
 17
 AT&T's March 23, 1977 tariff filing under Transmittal No. 12714, providing for termination of TELPAK, brought forth a number of pleadings from TELPAK users, requesting the Commission to suspend and investigate or reject the tariff revisions. These petitions raised a number of issues to be discussed later in this opinion. By an order adopted June 2, 1977 the Commission denied the petitions. 64 F.C.C.2d 959. The Commission noted that, although AT&T was no longer under compulsion to terminate TELPAK, the Commission having revoked its order requiring that termination, AT&T had independently concluded that TELPAK should be eliminated because of the provision requiring sharing and unlimited resale. 64 F.C.C.2d at 961; See also 64 F.C.C.2d 971, 986-87.
 
 
 18
 Following the Commission's decision on Transmittal No. 12714, Aeronautical Radio, Inc. and General Electric filed petitions for review in this court and, along with the Department of Justice on behalf of the government agencies as TELPAK users, sought temporary relief pending judicial review. Meanwhile, in view of the Commission's revocation of its order to eliminate TELPAK, AT&T, with the Commission's approval, extended the date for the termination of the TELPAK offering from June 8 to June 21, 1977, the effective date of the resale and shared use orders as they applied to TELPAK. Subsequently, on June 17, 1977 the Court of Appeals for the Second Circuit stayed the resale and shared use orders (as applicable to TELPAK) until July 22, 1977. Thereupon AT&T once again extended the effective date of the TELPAK termination until July 22, 1977.
 
 
 19
 A further stay of the Commission's resale and shared use orders was denied by the Second Circuit Court on July 21, 1977. On that same day this court denied the various motions filed by the TELPAK users, seeking a stay, mandatory injunction, and summary reversal of the Commission's decision which allowed AT& T's Transmittal No. 12714 to take effect. However this court on July 21, 1977 ordered, sua sponte, that AT&T be "enjoined from discontinuing the TELPAK offering to customers served and under the terms and conditions existing as of the date of this order," pending this court's review of the Commission's order on Transmittal No. 12714. Pursuant to our order, AT&T filed with the Commission tariff revisions which (1) provided that the TELPAK offering be discontinued as of July 22, 1977 in accordance with AT&T's previous tariff filing which the Commission had declined to suspend or reject, but (2) preserved the terms and conditions of the TELPAK offering as to existing customers. Thus, the status quo of the TELPAK offering has been maintained during the pendency of judicial review.[11]
 
 
 20
 On January 26, 1978 the Court of Appeals for the Second Circuit affirmed the Commission's resale and shared use orders, and the Supreme Court thereafter denied petitions for a writ of certiorari. American Tel. & Tel. Co. v. FCC, 572 F.2d 17 (2d Cir.), cert. denied, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978).
 
 II. ANALYSIS
 
 21
 We will discuss the issues in an order which does not necessarily correspond to the order in which they arose in these proceedings.
 
 A. FDC v. LRIC
 
 22
 The Department of Justice filed a brief on behalf of the United States as a statutory respondent; it did not file a petition for review on behalf of any agency which it represents. See United States v. ICC, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949). Nevertheless the Department contends that the Commission acted arbitrarily and capriciously in adopting fully distributed costs as its costing methodology. We reject this contention and affirm the Commission with respect to this issue.[12]
 
 
 23
 We emphasize that the question is not whether this court, if it were examining the merits of FDC Method 1, FDC Method 7, LRIC, or any other method, as a matter of first impression, would have selected one over the others. Rather, the question is whether the FCC made a reasonable selection from the available alternatives. The court does not substitute its judgment for that of the agency, but merely confines the agency within the areas within which it may reasonably exercise its discretion. See Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2223, 29 L.Ed.2d 701 (1971). And of course the Commission has broad discretion in selecting methods for the exercise of its powers to make and oversee rates. FPC v. Texaco, Inc., 417 U.S. 380, 387-89, 94 S.Ct. 2315, 2321-22, 41 L.Ed.2d 141 (1974); Permian Basin Area Rate Cases, 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1968).
 
 
 24
 In Docket No. 18,128 the Commission attempted to deal with AT&T's ratemaking in a way that would permit the company to compete fully in any markets without allowing it to use revenues from captive monopoly markets as a source for cross-subsidies. To accomplish this it was necessary for the Commission to learn as much as possible about the relevant cost of providing the different classes of service. The question was, which costs were relevant.
 
 
 25
 The Commission found that the relevant costs were fully distributed costs, which it prescribed as the standard for judging AT&T's rates. We cannot say that this standard is either impermissibly rigid and restrictive of AT&T's ability to compete, as the Department of Justice contends, or impermissibly vague as AT&T argues. We recognize that the Commission will not allow rates to depart from full costs without a strong public interest showing, and that guidelines remain to be worked out in negotiations with the FCC staff and in Commission actions on specific rate filings. We think however that the Commission's standard is both sufficiently flexible and sufficiently informative.
 
 
 26
 The Commission explained that FDC was in its judgment the standard most consistent with its regulatory responsibility and objectives. 61 F.C.C.2d at 589. In particular, the Commission found:
 
 
 27
 1. That knowledge of the full costs of service is essential to holding the carrier accountable for investment and pricing decisions, which, in turn, is the "touchstone" of just and reasonable ratemaking. 61 F.C.C.2d at 609-12.
 
 
 28
 2. That allocation of full costs to each service, with exceptions where "cost economies will be realized and can be demonstrated," is essential to avoid discriminatory pricing. Id. at 612-14, 626-27, 632-33.
 
 
 29
 3. That full cost definition and allocation are consistent with encouraging efficiency and innovation in providing service. Id. at 614-15.
 
 
 30
 4. That full cost standards are essential to enable potential and actual competitors to judge the attractiveness of markets with full knowledge of the "market rules." Id. at 615-18, 632-33.
 
 
 31
 Conceding that there was no perfect set of principles and that other methods than FDC also were plausible, id. at 606-07, 668, the Commission concluded:
 
 
 32
 (I)n order to determine whether rate levels and rate level relationships are just, reasonable or not unduly discriminatory the actual full costs of providing service must be known and certain, irrespective of whether rates are in direct relationship to costs or depart therefrom. In the latter case the ascertainment of actual full costs still provides the relevant standard to aid in the determination of lawfulness of rates.
 
 
 33
 Id. at 668.
 
 
 34
 The Department of Justice appears to assume that FDC pricing erects a "protective umbrella" over new entrants in private line markets, leaving AT&T with "virtually no freedom" to price competitively. (DOJ Br., pp. 34-40) The Department says the Commission's failure "rationally to consider" this effect on competition in private line market requires reversal.
 
 
 35
 In fact, competition was central to the proceeding. A prime objective was to establish market rules for established and emerging carriers.[13] And the agency was at pains to avoid placing a "protective umbrella" over new carriers. 61 F.C.C.2d at 615-19. On the other hand there was legitimate concern that failure to "get a handle" on AT&T's costs would enable the company to use cross-subsidies from monopoly services as an "anticompetitive 'protective umbrella' " of its own. Id. at 616.
 
 
 36
 In the end, the FCC found that LRIC pricing, whatever its merit in a purely competitive environment, should not be applied selectively to AT&T's competitive services in a manner that would burden monopoly service customers with all residual costs. Id. at 627-49. The Commission also considered and rejected the Defense Department's "alternative" marginal costing approach, finding it to have essentially the same defects as AT&T's LRIC. Id. at 632 n.77. Defense urged the adoption of FDC Method 7 if incremental costing were not acceptable. Id. at 661.
 
 
 37
 FDC is not the inflexible barrier to rate competition that the Department of Justice suggests. Although the Commission requires full cost data in support of all rate filings, its order expressly contemplates departures from full costs when the carrier can justify them on the ground of efficiency or other public interest grounds. Id. at 663, 666, 668. Competitive necessity is one basis for departing from full costs. Id. at 654-55. The standard for judging competitive necessity is essentially the same standard the Second Circuit approved in American Tel. & Tel. Co. v. FCC, 449 F.2d 439, 449-50 (2d Cir.1971).
 
 
 38
 A persuasive argument for FDC pricing rather than LRIC was made in comments filed by the Department of Justice in 1970 in the Specialized Common Carrier Services proceeding, Docket No. 18,920. (FCC Br., Attachment B) These comments were incorporated in Docket No. 18,128. Responding to AT&T's claim that it should be allowed to compete in the private line market by offering rates based on long-run incremental costs, the Department stated that:
 
 
 39
 1. Such costs are "too difficult to determine objectively, accurately or promptly."
 
 
 40
 2. The difficulty of determining the real costs would create the danger that AT&T would drive out or discourage new entrants "even if its cost is higher."
 
 
 41
 3. Low rates are not the only goal of communications policy, but must be considered along with innovation in services and improvements in quality that might come with new entry.
 
 
 42
 4. The Commission "should judge rates as predatory by means of a standard based on long run fully distributed costs."
 
 
 43
 5. "It is certainly true that the determination of 'fully distributed' or 'long-run average' costs involves estimates and somewhat arbitrary allocation formulas. Nevertheless, this standard is considerably more susceptible to regulatory control, and leaves less discretion in the regulated carrier, than in incremental cost approach."
 
 
 44
 The Commission rejected LRIC after considering the Department's current arguments in the light of its 1970 representations, together with the other relevant factors and policies. We cannot say that the Commission's conclusion, reached in the exercise of its discretion, was arbitrary or capricious and therefore we will not disturb it.[14]
 
 B. Unlawfulness of Certain Specific Rates
 
 45
 In its First Order on Reconsideration the Commission declared unlawful the revisions in the following rates and rate elements within the private line service categories: (1) increases in rates for teletypewriter station equipment, effective November 1, 1968; (2) changes in the TELPAK telegraph/telephone equivalency ratio, effective September 1, 1968 and February 1, 1970; and (3) several elements of the rates in the private line telephone, private line telegraph, and TELPAK offerings, effective May 4, 1972. The Commission's basic ground for this ruling was that AT&T had relied on long-run incremental cost studies to justify the increases. 64 F.C.C.2d at 989-91.
 
 
 46
 We have concluded that the FCC failed to take a sufficiently careful look at the problem presented, and failed to engage in reasoned decisionmaking with respect to this issue.[15] Accordingly we vacate the Commission's declaration of unlawfulness and remand the issue for further consideration. Stripped to its essentials, the Commission's reasoning is that because the increases were supported by long-run incremental cost studies, AT&T failed to meet its burden of justifying the rates. The Order contains no examination of the voluminous evidence of record, no analysis of the substance of the underlying cost studies, and no discussion of the rate element increases on their merits. This treatment cannot qualify as reasoned decisionmaking.
 
 
 47
 AT&T has pointed to certain record evidence, none of which is mentioned or discussed by the Commission, which substantiates its position. For example, the installation charge for new private line service terminals was being increased from $20.00 to $50.00.[16] The actual labor costs were shown to be $250.00.[17] Thus, with revenues of $50.00 and costs of $250.00, there seems to be no basis for the Commission's finding that the installation charge increases were not justified. Likewise, it would appear that the 1972 $5.00 increase in the monthly charge for private line telephone service terminals[18] would be justified. This increase would raise the average channel charge for short-haul distances of up to 25 miles to approximately $5.50 per mile, still less than the costs of $6.40. See Brief for Petitioner AT&T at 34-35.
 
 
 48
 A further consideration points to irrationality. The Commission concluded that LRIC data was insufficient to justify these rate increases, requiring instead that FDC data be supplied. However, LRIC understates costs, i. e., LRIC costs are lower than FDC costs because LRIC do not contain a portion of the overhead, as FDC do. If a rate increase is necessary to cover LRIC (which is what AT&T sought), it follows a fortiori that such an increase would be necessary to cover FDC.
 
 
 49
 Because of these considerations the Commission is directed to reconsider these rate increase requests in light of the points raised by petitioner AT&T. The Commission may of course require AT&T to furnish cost studies based on the appropriate FDC methodology prior to this reconsideration.
 
 
 50
 C. Past Rate Levels for Private Line Services
 
 
 51
 With respect to the rate levels for the private line service categories (other than TELPAK) the Commission, in its Final Decision, declared that: "Past levels of return for these services have generally been unlawfully low, although in some years the level of return for some services could be considered to have approached the zone of reasonableness." 61 F.C.C.2d at 652. Because the Commission reached this conclusion solely on the basis of the retroactive application of its newly-established FDC standard[19] without also (1) considering the non-cost factors which it takes into account, in determining the reasonableness of rate levels, or (2) explaining its failure to consider these factors, this action must be vacated and this issue remanded to the Commission for further consideration. Reasoned decisionmaking is again absent. See Greater Boston Television Corp. v. FCC, supra, 143 U.S.App.D.C. at 393-94, 444 F.2d at 851-52. To illustrate our conclusion, we point out the following: the Commission found that the return level for television program transmission service had been "unlawfully low" since 1971[20] without considering (1) its own requirement of reduced rates for educational television transmission;[21] (2) its own refusal to accept tariff filings during 1972-73 increasing commercial television rates;[22] and (3) its own sanction in 1973 of a stipulation freezing television rates for at least a two-year period.[23] Likewise, the Commission's finding that the rate level for the audio/radio program transmission category was too low in the 1967-75 period (61 F.C.C.2d at 651-52) does not take into consideration the stipulation, approved by the Administrative Law Judge in Docket 18128, preventing rate changes in that category for at least two years. FCC 70M-941 (1970) (J.A. 344). And it fails to factor in the Commission's requirement that reduced rates for radio transmission service be offered to the Corporation for Public Broadcasting and National Public Radio. See, e. g., 31 F.C.C.2d 496 (1971).[24]
 
 
 52
 Consequently, this portion of the Commission's decision is vacated and the issue is remanded for further consideration.
 
 D. Separation of Bureau Staff
 
 53
 Several petitioners have contended that the Commission's procedures were unfair because of the multiple roles of the Common Carrier Bureau staff in presenting evidence, drafting the Recommended Decision, and advising the Commission on its Final Decision. We observe with approval that the Commission in 1974 amended its rules to provide for a separated trial staff in proceedings such as those in this case, although the new rule is not being applied to proceedings already under way, including this one, due to the disruption and delay this would cause.[25]
 
 
 54
 We note that this same argument[26] was made at the beginning of these TELPAK proceedings but this court was not persuaded.[27] We decline to consider the point anew.[28]
 
 E. Failure to Prescribe Telpak Rates
 
 55
 Petitioner Aeronautical Radio, Inc. contends that the Commission unlawfully failed to prescribe rates for TELPAK service under 47 U.S.C. § 205(a). That section empowers the Commission to prescribe rates if, after full opportunity for a hearing, the Commission is of the view that the rates set by the carrier are unlawful. Here the Commission has made no finding that TELPAK is unlawful and has, indeed, stated that the TELPAK rate levels "appear to be within the zone of reasonableness." 61 F.C.C.2d at 659. In any event, we are of the view that, considering the circumstances of this case, the Commission has not abused its discretion in this matter and therefore we will not interfere.
 
 F. Refusal to Reject Transmittal No. 12714
 1. 47 U.S.C. § 214(a)
 
 56
 Several petitioners say that the Commission erroneously failed to reject Transmittal No. 12714 when that filing, which would eliminate TELPAK, was not accompanied by the requisite authority under section 214(a) of the Communications Act (47 U.S.C. § 214(a) (1976)). Section 214(a) requires that
 
 
 57
 No carrier shall discontinue, reduce, or impair service to a community or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby . . . .
 
 
 58
 AT&T did not seek, and the FCC did not purport to grant, a § 214(a) certificate in this case.
 
 
 59
 The Commission held that "Section 214 does not apply to the instant tariff revisions" because the termination of TELPAK constituted a tariff change rather than the discontinuance of a service. 64 F.C.C.2d at 965.
 
 
 60
 On a question of statutory interpretation like that involving Section 214, this court must show "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The agency's interpretation "should be followed unless there are compelling indications that it is wrong." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). There are not such indications here.
 
 
 61
 We agree with the FCC's holding that § 214(a) did not apply in this case. The termination of the TELPAK "service" did not in fact discontinue, reduce, or impair any service at all; all it did was eliminate a rate discount, thereby effectuating a rate increase. All the services which had been offered under the TELPAK tariff were still available thereafter from AT&T pursuant to other tariffs or other sections of the same tariff; only the rates differed. See 64 F.C.C.2d at 965. See also American Tel. & Tel. Co. v. FCC, 449 F.2d 439, 446 n.5 (2d Cir. 1971) ("(T)he customer uses precisely the same physical facilities whether his service is ordinary private-line, Telpak, or shared Telpak.") Were we to accept petitioner's view, virtually every rate increase might be argued to be a discontinuance of "service" requiring a prior finding of convenience and necessity by the Commission. The attendant burdens would be enormous. Likewise, such a construction would be at odds with the scheme of carrier-initiated tariff filings which is at the heart of the Communications Act. 47 U.S.C. §§ 203-205 (1976).
 
 2. Reviewability and 47 C.F.R. § 61.38
 
 62
 Section 61.38 of the Commission's rules, 47 C.F.R. § 61.38, requires certain supporting economic data to be filed with proposed tariff changes.[29] In this case the Commission held that § 61.38 was not applicable to the TELPAK filing. 64 F.C.C.2d at 966. In addition, the Commission held that, even if § 61.38 were applicable, it would exercise its discretion and waive the rule. Id. Petitioners asserts that because § 61.38 was applicable and its waiver by the Commission was an abuse of discretion, we must order the agency to reject the tariff filing. (Jt. Br. of Aeronautical Radio and Air Transport Ass'n of America at 26). We hold that this court cannot review the Commission's decision to accept the tariff filing at this time. Failure to comply with the tariff filing rule of § 61.38 creates no power in this court to compel rejection.
 
 
 63
 a. The Commission's acceptance of the tariff filing is not reviewable at this time.
 
 
 64
 This court has repeatedly held that agency decisions relating to the acceptance of a tariff filing are non-final orders, generally not subject to judicial review.[30] Most recently in Pagago Tribal Utility Authority v. FERC, 628 F.2d 235 (D.C. Cir. 1980), cert. denied, --- U.S. ---, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980) this court declined to review the acceptance by the FERC of a rate filing under the Federal Power Act where patent defects in form or content were alleged.[31] At 247. The court asserted that acceptance orders are generally unreviewable when they are (1) non-final, (2) result in no irreparable harm to the party seeking review, and (3) constitute a province reserved to agency discretion. At 239.
 
 
 65
 The decision of the FCC to accept the AT&T tariff filing satisfies the Papago criteria of unreviewability. The acceptance is non-final because it is the initiation of an administrative proceeding. The Commission merely accepted the tariff and did not rule on the lawfulness of the rates to be paid by former TELPAK customers. The act of acceptance creates no irreparable harm because investigatory hearings are available for examination of the filing on the merits. 47 U.S.C. §§ 206-209, Papago, at 240-41. Finally, the decision to accept the filing is reserved to Commission discretion because it is a "necessary adjunct to the unreviewable decision to suspend and investigate." Papago, at 243. See Southern Railway Co. v. Seaboard Allied Milling Corp., 442 U.S. 444, 454, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979); Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 667-669, 83 S.Ct. 984, 988-990, 10 L.Ed.2d 52 (1963). As the court in Papago observed, "It would make little sense to declare orders concerning suspension and investigation unreviewable if the courts may review the related order to accept a rate filing." (At 243)[32]
 
 
 66
 The Papago decision relied upon a series of Supreme Court cases,[33] including the Southern Railway decision, in which it was held that appellate courts have no power to interfere with agency discretion by undertaking to review suspension, investigation, and rejection decisions. 442 U.S. at 452, 99 S.Ct. at 2393, 60 L.Ed.2d 1017 (1979). In the Southern Railway case the Interstate Commerce Commission accepted a railroad tariff increase without suspension, investigation, or hearing, despite assertions by protestant shippers that the rates were patently illegal. 442 U.S. at 449, 99 S.Ct. at 2391. The Court held the ICC actions to be non-final and unreviewable because the complaint procedure of the Interstate Commerce Act, "which allows shippers to initiate mandatory post-effective proceedings to inquire into and remedy violations of the Act, would still be available to 'protect' persons aggrieved by the rates." 442 U.S. at 450, 99 S.Ct. at 2392 (footnote omitted). In the present case, as in Southern Railway, there has been an acceptance of a tariff increase without suspension, investigation, or a hearing, and a complaint procedure under the Communications Act comparable to that of the Interstate Commerce Act is available for former TELPAK customers.[34] The Papago and Southern Railway cases require us to hold that the availability of a statutory complaint procedure renders the FCC's acceptance decision in this case non-final.
 
 
 67
 b. The Commission's waiver of Rule 61.38 is not reviewable.
 
 
 68
 Cost justification information is submitted pursuant to the FCC's tariff filing rules primarily to aid the Commission in exercising its discretion as to investigation and suspension of tariff filings. Tariffs-Evidence, 40 F.C.C.2d 149, 152-153 (1973). It follows that the FCC's determination as to what data it requires in making this discretionary decision cannot provide a basis for this court to mandate rejection of the tariff filing. Although another purpose of the tariff filing rules is to provide customers, competitors, and the public with information that will serve as a basis for comment,[35] the rules were not "intended primarily to confer important procedural benefits upon individuals." American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 538, 90 S.Ct. 1288, 25 L.Ed.2d 547(1970); Associated Press v. FCC, 145 U.S.App.D.C. 172, 181, 448 F.2d 1095, 1104 (1971). An agency is permitted to relax, modify, or waive its filing requirements, City of Groton v. FERC, 190 U.S.App.D.C. 86, 89 n.8, 584 F.2d 1067, 1070 n.8 (1978), and such action is not reviewable except upon a showing of substantial prejudice to the complaining party. Papago, slip op. at 22. Given the complaint remedy under the Communications Act, no substantial prejudice of an irreparable nature exists in this case.[36]
 
 
 69
 This court nevertheless regrets the Commission's summary procedures as applied here. Such actions deprive the public of potentially valuable information and force protestants to institute a cumbersome complaint procedure to address the merits of the tariff revision. For the reasons noted above, however, we cannot review the Commission's orders until the statutory complaint procedures have been followed. Because we find that there has been no reviewable final order in the Commission's proceedings, we direct that the petition for review be dismissed.
 
 Judgment in accordance with this opinion
 And it is
 
 70
 FURTHER ORDERED, by the court, that intervenor's petition for rehearing is granted, for the reasons set forth in the panel opinion on rehearing filed this date.
 
 WILKEY, Circuit Judge, dissenting in part:
 
 71
 While I concur in the bulk of the majority's opinion, I believe my colleagues too hastily accept one part of the Commission's ratemaking prescriptions in Docket No. 18,128, in re American Telephone & Telegraph Co.,[1] which I find arbitrary and capricious. The FCC's order in Docket No. 18,128 prescribes the use of Fully Distributed Costs (FDC) as the required standard for calculating rates both in monopoly markets and in competitive markets. As a ceiling for rates in monopoly markets, it is reasonable to use a standard based on FDC as a means to prevent monopoly pricing. But for the entirely different task of setting a rate floor in competitive markets, FDC pricing should not be hastily approved without scrutiny of its economic rationality in this context. In its choice of FDC pricing in this case, the FCC has shown a serious misunderstanding of the nature of pricing decisions in competitive markets. This misunderstanding has led the Commission to adopt FDC pricing without rational consideration of its anticompetitive effects in a competitive market, and without showing that this standard is rationally related to the Commission's legitimate regulatory purposes.
 
 
 72
 I must therefore dissent from Part II A of the majority opinion insofar as it upholds FDC as a standard for establishing rates in competitive markets. For the same reason, I must also concur separately in the majority's Part II C; while I agree in vacating and remanding the Commission's findings as to specific rates, I would not permit the Commission on remand to evaluate specific rates by a standard that embraces FDC for minimum pricing in competitive markets.
 
 
 73
 As the majority opinion states, our task in reviewing challenged Commission actions of this sort is limited to keeping the Commission within proper bounds for the reasonable exercise of its discretion. While agencies do have broad discretion in ratemaking proceedings,[2] we must also keep in mind that "the width of administrative authority must be measured in part by the purposes for which it was conferred . . . ."[3] The rationality of the Commission's prescribed FDC costing methodology is challenged both by petitioner American Telephone and Telegraph Co. (AT&T),[4] and by the United States Department of Justice in its role as a statutory respondent.[5] The significance of the fact that the Antitrust Division and AT&T not usually found as allies in legal contests are in thorough agreement that the Commission has embraced some fundamentally unsound economics, as the underpinning of its whole decision on this point, should not be minimized.
 
 
 74
 To evaluate the rationality of the Commission's prescribed FDC pricing for competitive markets, we must therefore first define the legitimate purposes of FCC rate regulation. The Commission derives its authority to regulate rates for communication services from Title II of the Communications Act of 1934. The Act sets broad standards requiring that rates be "just and reasonable"[6] and prohibiting "unjust or unreasonable discrimination" and "undue or unreasonable preference or advantage."[7] In monopolized markets FCC rate regulation serves the purpose of limiting carriers to just and reasonable rates in order to prevent monopoly pricing. In competitive markets, on the other hand, just and reasonable prices are normally maintained through the effect of free competition indeed, regulation of "just and reasonable" rates is essentially a replacement or surrogate for the effects of free competition.[8]
 
 
 75
 As a general matter, then, competitive markets do not need the constant rate regulation that is necessary to ensure just and reasonable prices in monopoly markets. But a potential does exist for unjust or discriminatory prices to arise in non-monopoly markets, in a manner that can warrant rate regulation. When a firm operates in a regulated market where it enjoys a monopoly, and also operates in a separate market where it faces competitors, there is a danger that the firm may reduce its rates in the competitive market below the level that would fully compensate for its costs of operation in that market. The use of this technique to drive competitors out of the market or to keep potential competitors out is often called "predatory pricing."[9] If a regulated firm such as AT&T engaged in predatory pricing, its losses or below-normal profits in the low-price competitive market could be offset by increasing its profits in the firm's monopoly markets. Even if the firm's overall rate of return were within just and reasonable limits set by the regulatory agency, the customers in the monopolized market could find themselves paying higher than reasonable rates in order to finance the firm's predatory pricing activities in the competitive market. An unjust and discriminatory system of "cross-subsidies" could thus arise, with the monopoly market customers paying more than their fair share in order to subsidize the firm's activities in competitive markets.
 
 
 76
 The FCC focuses on this danger to justify its regulation of minimum rates for AT&T in the competitive market of private line services. As its basic regulatory objective here, the FCC seeks costing and pricing standards that will allow AT&T to compete in a new and competitive market "without allowing it to use revenues from captive monopoly markets as a source for cross-subsidies."[10] The existence of cross-subsidies would violate the Commission's goal of equitable and nondiscriminatory treatment of all service users,[11] and would permit AT&T to exploit resources acquired through its privileged monopoly status in other markets to gain an unfair advantage against other firms in the competitive market.[12]
 
 
 77
 There is no question that preventing cross-subsidies is a legitimate regulatory purpose of the FCC; the issue is whether FDC pricing is a means rationally related to this end, or whether Long Run Incremental Cost (LRIC) pricing will more surely achieve this regulatory end. As a preliminary matter, it is important to note that prevention of cross-subsidies does not justify any and all standards for minimum rates. The establishment of exorbitantly high minimum rates would certainly prevent cross-subsidies; but it would also stifle competition and seriously harm AT&T's consumers in the competitive market, who have a strong interest in low prices. This indicates that the goal of preventing cross-subsidization exists in tension with the goal of promoting competition. The FCC has discretion to choose within a range of minimum rate standards that are rationally related to preventing cross-subsidization. But if the Commission sets minimum rates at a level higher than is rationally related to the goal of preventing cross-subsidies, then the Commission impairs competition without rational justification, and is subject to judicial reversal for arbitrary and capricious action. This standard of review is nothing more than a specific application of the general principle quoted above, that the agency's authority is to be measured by its purposes.
 
 
 78
 To decide what minimum level of rates is reasonable in a competitive market, the starting point is the ascertainment of the firm's costs for providing particular services in that market.[13] Although it acknowledges that cost is not the sole criterion of reasonableness, the FCC requires as a first step that rate levels be justified in terms of the cost of providing a particular service.[14] Controversy arises from the various methods of determining costs, and from the fact that certain costs may be relevant for one purpose but not for another. The Commission maintains that in order to prevent cross-subsidization, rate levels must be calculated in relation to Fully Distributed Costs. AT&T's proposal to calculate rates in competitive markets based on long run incremental costs, the Commission concludes, is inadequate to prevent cross-subsidies.
 
 
 79
 FDC and LRIC are alternative methodologies for calculating the costs that relate to a particular service. Under either methodology the Commission calculates the relevant costs, and then compares the cost figures with the rate level for that service. If the rates for a particular service are either higher or lower than the relevant cost figures, then the Commission can disapprove them as not cost-justified. In the present case the Commission aims to discover whether rates are sufficiently high to compensate for all relevant costs; if they are not, then the low-rate service is presumably being cross-subsidized by revenues from other services. A common aspect of both FDC and LRIC as used in this case is that a cost of capital figure is included in costs, so that when rates equal costs for a particular service, the utility is earning a rate of return equal to the cost of capital figure, in other words, a "normal" profit.
 
 
 80
 The difference between FDC and LRIC arises from the fact that some costs of any firm are inherently unattributable to any particular service category. Firms such as AT&T provide monopoly and competitive services through an integrated network with extensive use of common facilities, management, and marketing resources.[15] These common or joint costs[16] cannot be said to be related in an ascertainable way to any particular service category; rather they relate to all service categories indistinguishably. In terms of the present case, these unattributable fixed overhead costs do not increase when AT&T decides to start offering private line services as a new category of service, and they do not decrease when AT&T decides to discontinue private line services.
 
 
 81
 The LRIC method assigns to each service category only those costs attributable to that category, that is, only the long-run increment to pre-existing firm costs that arises when the service category is added to existing service categories. This increment includes the variable costs incurred in providing the service plus any additional fixed overhead costs required in the long run due to the addition of the new service. But the increment does not include common or joint costs that existed before the new service was offered and would exist if the service were discontinued. Under LRIC, such unattributable costs are not assigned to any individual service category.
 
 
 82
 Under FDC pricing, on the other hand, these unattributable costs are assigned by a formula to individual service categories. The formula attempts to allocate common and joint costs among the services according to the proportionate use each service makes of those facilities. Rate levels are then computed to cover the attributable costs of the service category plus its calculated share of common unattributable costs. There is of course no "right" way to assign unattributable costs seven different formulas were considered by the Commission in this proceeding, each having various advantages and disadvantages. But FDC pricing starts from the premise that all costs must be assigned to some service category, and proceeds to assign them by a selected formula that is consistent, even if inevitably arbitrary. When calculating maximum allowable rate levels for a regulated firm, some formula must be chosen for allocating common and joint costs; otherwise such costs would be left out of the firm's rate base, and its total revenue from all service categories would fail to cover its unattributable costs.[17]
 
 
 83
 There is no serious doubt that FDC pricing is appropriate for establishing maximum allowable rate levels; for this purpose an FDC standard ensures that the firm will recover all costs while not making more than a normal allowable profit. The controversial issue is whether FDC is also reasonable for the purpose of setting minimum rates in competitive markets.
 
 
 84
 In its decision choosing FDC pricing for AT&T's competitive markets, the FCC relies on an assumption, which runs either tacitly or explicitly throughout its opinion, that unless competitive service customers pay for the fully distributed costs of their services, monopoly service customers will be subsidizing the competitive service market. The Commission's rejection of LRIC pricing flows from a belief that any pricing system based on marginal or incremental costs, omitting common and joint costs, will lead to cross-subsidies. This fundamental hostility toward marginal cost pricing is found most explicitly in the words of the Recommended Decision, quoted in the FCC's opinion, that it "has not been conclusively shown that marginal cost pricing can be applied to one service without a subsidy from some other service or source."[18]
 
 
 85
 The Commission also makes this assumption explicit when, in evaluating AT& T's rate structure, it reasons that the failure of AT&T to generate revenues for its TELPAK and private line services sufficient to cover fully distributed costs means that the rate structure is maintained through cross-subsidization.[19] The Commission states that "our solution in this proceeding is designed to achieve return levels for these services whereby the earnings for each competitive service can sustain that service's viability without relying on cross-subsidization."[20] The same assumption is stated clearly in the additional concurring views of Chairman Wiley, that under an incremental cost methodology, "AT&T would be free to subsidize private line service offerings at the expense of the telephone ratepayer."[21]
 
 
 86
 The FCC position rests on the notion that unattributable common and joint costs must be borne proportionately by monopoly and competitive service customers. An LRIC standard for minimum pricing in competitive markets, of course, does not require competitive service customers to bear any common or joint costs, but only the incremental costs the firm incurs in serving them. As stated in its appellate brief, the FCC position maintains that LRIC pricing "should not be applied selectively to AT&T's competitive services in a manner that would burden monopoly service customers with all residual costs."[22]
 
 
 87
 The central point in this case is that, contrary to the FCC's assumption, the long run incremental cost standard when properly applied does NOT and can NOT result in a "subsidy" of competitive service customers by monopoly service customers. This point is apparent from an application of common sense to the facts of this case, and it is borne out by the analysis of economists with much greater consensus than is commonly seen in that profession. Unfortunately the majority opinion simply defers to the contrary assumption of the FCC without analyzing its rationality.22a I believe that upon scrutiny the FCC's assumption collapses, and leaves the Commission's decision without rational support.
 
 
 88
 We begin from the fact that the competitive private line services market is a new market for AT&T, and that AT&T's success in the market depends on its ability to set prices as low as its competitors. It follows from the nature of a competitive market that if AT&T raises prices it will tend to lose customers. Private line customers might either go to a competing supplier or set up their own microwave communications system. The FCC mentions that AT&T faced competition from terrestrial and satellite carriers in the intercity private line market, and from the authorization of private microwave systems.[23] The higher AT&T is forced to maintain its prices the greater will be its loss of customers to these alternatives.
 
 
 89
 By contrast, AT&T does not face the same pressures to lower prices in its monopoly service markets. By definition, these markets do not present AT&T with competitors bidding for the patronage of various AT&T customers. Thus AT& T can keep its prices at higher levels in monopoly markets with less tendency to lose customers.
 
 
 90
 With these facts in mind, it becomes critical to recognize the additional fact that AT&T's common or joint unattributable costs will exist whether or not it offers services in the competitive market. These costs existed and were borne by AT&T's monopoly service customers before AT&T entered the competitive market, and would again be borne fully by them if AT&T were forced out of the competitive market.
 
 
 91
 When AT&T considers whether to enter or to expand sales in a competitive market, the old monopoly service customers stand to benefit so long as the new customers bear any part of the common or joint costs. To determine whether monopoly customers will benefit from the firm's operations in the competitive market, one need only calculate whether the revenues from the new competitive market operations pay fully for the incremental or additional costs the firm incurs for these operations. If revenues cover these costs (including cost of capital) as measured by LRIC or any similar variant of marginal cost measurement, then ANY additional revenue earned above the LRIC level is a bonus for the monopoly customers. Any revenue above the LRIC level can be used to cover part of the common or joint costs of the overall firm operations, thus reducing the amount of common or joint costs borne by monopoly service customers and allowing a rate reduction for them. At any rate level above LRIC in the competitive market, monopoly customers are better off than they would be if the firm were not making such sales in the competitive market. Only if services are offered in the competitive market at less than LRIC do the monopoly service customers have to pay a higher rate than they would absent operations in the competitive market.
 
 
 92
 To say that LRIC forces all the joint or common costs onto monopoly service customers ignores the fact that they were burdened with the full measure of these costs in the first place, and the company's expansion into the competitive market at rates above LRIC reduces the absolute amount of that burden. If monopoly service customers are not burdened more severely under LRIC than they were before AT&T entered the competitive market, then there is no reasonable argument that monopoly service customers are providing a "cross-subsidy."
 
 
 93
 Of course, the monopoly service customers would be even better off if the firm could raise rates for its competitive market services to the FDC level rather than just to the LRIC level but only if the increase in rates does not produce a serious drop in sales. If demand is elastic, the increase in rates will actually produce a decrease in revenues.[24] The exact degree of elasticity is difficult to measure, but the general tendency is for more competitive markets to have more elastic demand. Indeed, one economist states that "the most powerful determinant of the elasticity of demand for the services of any single company is the presence or absence of competing suppliers."[25]
 
 
 94
 It is primarily a business decision, to be left to the judgment of the firm, what level of rates will produce the highest revenues. Neither an agency nor a court can predict the revenue effects of each rate increase or decrease. But so long as rates are above LRIC, agencies and courts can rest assured that monopoly service customers are NOT subsidizing the firm's operations in the competitive market ; those customers pay no more under such circumstances than they would if the firm were not in the competitive market. How much above LRIC the firm can set its prices and still remain competitive and maximize revenues, is a decision that can safely be left to private business judgment. In its pursuit of maximum allowable profit, the firm has ample incentive to set its rates as far above LRIC as the market will bear. If the firm chooses not to set its rates significantly above LRIC, the logical explanation is that competitive pressures prevent higher rates. The role of agencies and courts is only to keep prices above predatory pricing levels, to prevent cross-subsidies, and to keep rates below monopoly pricing levels. Within these bounds, pricing discretion should rest with the firm:
 
 
 95
 As long as a public utility company can take business away from its competitors at rates that cover long-run incremental costs for that business, both efficiency in the performance of the public utility function and the interest of all rate-payers recommend its being permitted to do so, all other things being equal.[26]
 
 
 96
 This common sense analysis is exactly the conclusion drawn by economists. It is the nearly universal view among economists that marginal or incremental costs are more relevant to competitive market pricing than are full costs.[27] Economists generally agree that economic efficiency is served when prices approximate marginal costs.[28]
 
 
 97
 For example, Aldred E. Kahn (currently head of the Council on Wage and Price Stability) states explicitly that when prices for elastic demand customers (as in a competitive market) are held no lower than the full additional costs of taking on that additional business, and prices for inelastic demand customers (as in a monopoly market) are held no higher than average total cost, then there can be no internal subsidization.[29] The LRIC pricing method is designed precisely to determine the full additional costs of additional business in a competitive market. If properly applied, it is sufficient to prevent cross-subsidies.
 
 
 98
 The LRIC method is a specific application, in modified form, of marginal cost pricing. Samuelson describes the rationale, from an individual firm's perspective, for making pricing decisions according to extra or marginal costs, while viewing sunk costs such as the common and joint costs of AT&T as "bygones":
 
 
 99
 Let bygones be bygones. Don't look backward. Don't moan about your sunk costs. Look forward. Make a hard-headed calculation of the extra costs you'll incur by any decision and weigh these against its extra advantages. Cancel out all the good things and bad things that will go on anyway, whether you make an affirmative or negative decision on the point under consideration.[30]
 
 
 100
 The LRIC method is designed to perform exactly this sort of calculation, to compare additional revenues i. e., rates for competitive services with the incremental costs of providing those services. The FDC method, by contrast, would force AT&T to focus on the "bygones" while its competitors are free to employ a more rational form of competitive pricing.
 
 
 101
 Kahn concludes that long run marginal costs are the proper starting point for assessing the validity of competitive rate reductions by regulated companies in competitive markets.[31] Society has an interest in communications services being provided at lowest possible cost, and economic efficiency considerations require "that no business be turned away that covers the costs to society of providing that service."[32] LRIC is calculated to achieve precisely this efficiency, FDC is not. It is important to note that Kahn does envision limited circumstances in which long run marginal costing would not be appropriate,[33] but the Commission did not even consider whether such special circumstances might make this case an exception to the general desirability of marginal or incremental cost pricing.
 
 
 102
 The Commission did not directly attack the desirability of marginal cost pricing. At some points in its decision, the Commission appeared to concede the theoretical merits of marginal cost pricing,[34] while at other points it implied that marginal cost pricing would necessarily lead to cross-subsidies. Rather than attack the marginal cost pricing concept directly, the Commission objected that LRIC is not truly a marginal cost technique,[35] and it is true that LRIC does not price according to the cost of producing the marginal single unit of service. But in fact LRIC, by focusing on long run increments to joint and common costs as well as the additional variable costs of producing the extra units, sets a cost figure that is likely to be higher than pure marginal costs.[36] Thus LRIC leaves even less chance of cross-subsidies and predatory pricing by requiring higher rates than pure marginal cost. This factor explains why it is that those with an institutional concern for the prevention of predatory pricing, such as the Antitrust Division of the Justice Department, can support LRIC pricing in the present case.
 
 
 103
 In short, the FCC's assumption that FDC pricing rather than LRIC is necessary to prevent cross-subsidies is clearly contrary to a common sense evaluation of the facts and to commonly accepted economic theory. As a result the Commission has not shown its standard for minimum rates to be rationally related to the prevention of cross-subsidization. By choosing a standard that requires high rates without a showing of reasonable connection to a legitimate regulatory purpose, the Commission has unjustifiably restrained competition and imposed an unjustifiable price burden on AT&T's competitive service customers. (Hence the position and role of the Antitrust Division in this case.) The Commission's invalid assumption and conclusions regarding FDC and LRIC pricing reflect a thoroughly uncertain grasp of the fundamentals of pricing in the industry it regulates. By accepting the Commission's decision at face value, the majority does nothing to shake it from these fallacies.
 
 
 104
 The Commission raised several more objections against LRIC pricing in addition to its assumption that LRIC pricing would allow cross-subsidies. While it might be permissible for the Commission to choose FDC pricing after deciding that these other factors outweigh the positive value of LRIC, a rational balancing is not possible unless one first acknowledges the positive value of LRIC i.e., that it prevents cross-subsidies without impairing competition as severely as does FDC.
 
 
 105
 For purposes of clarification, it is appropriate to comment on the merit of these additional arguments against LRIC. First is the argument that raising prices in the competitive market will not lose competitive service customers for AT&T. The FCC considers it "arbitrary" of AT&T to single out competitive service customers for marginal cost pricing; why, the Commission asks, doesn't the firm use marginal cost pricing for monopoly customers as well?[37]
 
 
 106
 The simple answer is that it is only the competitive service customers who are likely to be lost through slight increases in prices. The ground for difference in treatment is that elasticity of demand is greater in competitive markets than in monopoly markets.[38] It is only in the competitive market that AT&T must respond to competition by keeping rates at a low competitive level. Thus it is simply the facts of economic life, and not an invidious bias against monopoly service customers, that induces AT&T to lower its competitive service prices toward the LRIC level. As we have seen pricing anywhere above LRIC cannot result in a subsidy. The Commission, on the other hand, appears to reject elasticity-based pricing generally, when it states (quoting the Recommended Decision) that
 
 
 107
 (w)hen economists suggest (as in this proceeding) the use of 'inverse elasticity rules' for price discrimination among services or classes of customers to allow the company to meet its overall revenue requirement, they are suggesting that those customers with inelastic demand subsidize those with elastic demand.[39]
 
 
 108
 To follow the reasoning of this statement to its logical conclusion would prohibit elasticity-based pricing wherever found for all regulated firms such a direct contradiction of the normal workings of competitive pricing is not justified by the record or reasoning of the Commission in this case.
 
 
 109
 This line of reasoning leads to a further grave flaw in the Commission's opinion. By requiring an increase in competitive service rates to the FDC level in order to prevent cross-subsidies, the Commission implicitly assumes that this increase in rates will produce a rise in revenues. But this will happen only if demand is inelastic. Not only has the Commission shown no reason to believe that demand is inelastic, but it admits that this is a competitive market, which by nature should tend toward elastic demand. Thus the Commission has offered no evidence to show a probability or even a reasonable hope that raising AT&T's competitive service rates to the FDC level will not price AT&T out of the market, and thus eliminate any and all contribution that the competitive service customers were making to common and joint costs.
 
 
 110
 The Commission perhaps recognizes this flaw in its reasoning, for it argues that even if AT&T loses competitive service customers with price increases in the competitive market, its expanding monopoly services will soon utilize the idle facilities.[40] But the existence of idle facilities is not the important factor here; the important fact is that without competitive service customers, the firm loses the contribution to common or joint costs that is provided whenever competitive service customers pay a rate even slightly higher than LRIC. Thus the loss of competitive service customers will hurt monopoly service customers, whether or not the competitive service facilities remain idle only temporarily.
 
 
 111
 Finally, the FCC maintains that whatever the merits of LRIC pricing, the Commission's other objections justified the use of FDC pricing.[41] The Commission emphasizes the objective of accountability, which requires that any costing methodology be verifiable so that the FCC can ensure that AT&T will not allow cross-subsidies to arise in its pricing structure.[42] The Commission alleges that LRIC is subjective, in the sense that it "is heavily dependent upon judgmental decisions which cannot be verified or tested by the Commission."[43] While such considerations may certainly enter into a rational weighing of the merits of LRIC versus FDC, the Commission should not overlook the subjectivity and arbitrariness that are unavoidable in the FDC method, which performs the inherently arbitrary task of assigning unattributable costs to particular services. And if current reporting procedures do not generate data for the verification of LRIC pricing, the FCC should consider the possibility of developing procedures that can generate such data.
 
 
 112
 The FCC also maintains that its allowance for price reductions below FDC upon a showing of competitive necessity supports the rationality of its decision.[44] There are two criteria for allowing a competitive necessity exception to the general requirement of FDC pricing: (1) an alternative supply source that customers will utilize unless they are given the benefits of price discrimination, and (2) a benefit from discrimination for users who are discriminated against.[45] The problem is that the Commission's requirement of a showing of a "real competitive threat"[46] is very difficult to satisfy, and was not satisfied in this case, even though the market in question was admittedly competitive. The FCC's standards ignore that if there is a legitimate concern on the part of the firm for pricing at low levels, it must be because there are actual or potential competitors. The FCC conceded that the private line services market is a competitive market when it initiated Docket No. 16,258.[47] But it apparently will allow competitive pricing in competitive markets only upon a showing of exceptional circumstances. The "zone of reasonableness," that the Commission claims to allow for prices,[48] thus turns out to exist only in exceptional cases.
 
 CONCLUSION
 
 113
 As stated above, it is possible that a rational balancing of all factors might favor FDC pricing, despite the economic pro-competition advantages of LRIC and its ability to prevent cross-subsidies. The economic muddle of the FCC's analysis in this case, however, makes it clear that the Commission never recognized the economic merits of LRIC, and that it assumed FDC pricing to be necessary to prevent cross-subsidies. It thus was unable to give rational consideration to the balancing of the needs to promote competition and to prevent cross-subsidies, which under all standards of judicial review makes it impossible for this court to affirm agency action demonstrably resting on no rational base.
 
 
 114
 The primary effect of forcing AT&T's competitive service prices up to the FDC level is to protect its competitors in that market. In the words of the Department of Justice, "the Commission confuses protecting competitors and protecting competition."[49] This result contrasts sharply with the Commission's earlier announced policy of refusal to provide a "protective umbrella" for new entrants into AT&T's markets.[50] And it imposes a high cost on AT&T's consumers, a cost not justified on the record before us.
 
 
 115
 The complexity of analysis in this case might lead one to question the certainty with which a court can say that the Commission acted arbitrarily.50a But in this case the arbitrariness of the FCC's reasoning is very simply and clearly demonstrated by the absurdity of its result: under the FCC's prescribed costing procedures, the maximum level of rates set to prevent monopoly pricing is exactly identical to the minimum level established to prevent predatory pricing and cross-subsidies. The Justice Department accurately summarizes the effect of this ruling as follows: "AT&T, subject to extremely narrow waiver provisions, will as a practical matter have virtually no freedom to price a service any differently than it prices its basic monopoly service, notwithstanding possible efficiencies."[51] If AT&T raises rates above the prescribed level, it is guilty of monopoly pricing; if it lowers them below this level, it is guilty of cross-subsidizing and, in effect, predatory pricing or so decrees the Commission.
 
 
 116
 Even apart from economic analysis, common sense alone suffices to show that there must be some range of prices, within which firms have discretion to choose in a competitive market without being immediately accused of either monopoly pricing or predatory pricing. Otherwise business judgment and price competition have no role whatever in the market. Much as courts should normally defer to an agency's expertise, there is some limit beyond which a court must step in. When an agency arrives at a decision so contrary to common sense and economic logic as this, we have reached that limit.[52]
 
 
 117
 I would therefore vacate the relevant parts of the Commission's decision and remand; hence I respectfully dissent from Part II A and concur separately in Part II C of the majority opinion.
 
 On Petition for Rehearing
 
 118
 Opinion for the Court filed by Circuit Judge ROBB.
 
 ROBB, Circuit Judge:
 
 119
 The American Telephone & Telegraph Company (AT&T) seeks a rehearing, asserting, among other things, that this panel erred in (1) reviewing the decision of the FCC to accept the TELPAK rate filing and (2) ordering the FCC to reject the filing on the ground that the agency abused its discretion in waiving Rule 61.38 (47 C.F.R. § 61.38). (Petition of AT&T at 2) AT&T argues that this panel's decision conflicts with the decision of another panel of this court, Papago Tribal Utility Authority v. FERC, 628 F.2d 235 (D.C.Cir. 1980), cert. denied, --- U.S. ---, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980) as well as with a Supreme Court decision relied upon by the Papago court, Southern Railway Co. v. Seaboard Allied Milling Corp., 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979). (Petition of AT&T at 2-3) Because we are in substantial agreement with these contentions we grant the petition for rehearing and amend the panel decision by the attached order.
 
 
 120
 Our initial decision to review the Commission actions and to compel rejection of the filing was based on our conclusion that the agency had been unjustifiably summary in its procedures, given the $100 million per year impact of this tariff revision. The events preceding the acceptance of the TELPAK filing suggest that but for the Commission's rescinded order of discontinuance, the agency would likely have required the § 61.38 cost justification date. As noted in the original panel opinion, Aeronautical Radio, Inc., et al. v. FCC, 642 F.2d 1221 at 1227-1228 (D.C.Cir. 1980), the FCC initially ordered AT&T to discontinue TELPAK. Such agency-initiated rate changes are not subject to the § 61.38 requirements. Subsequently, after the FCC ordered resale and sharing of the TELPAK service and withdrew its termination order, the tariff revision at issue (a carrier-initiated discontinuance) was filed by AT&T. Id. The Commission, we felt, employed the summary acceptance procedures which were appropriate for an agency-initiated discontinuance but which were inappropriate in the new circumstances. For this reason we ordered rejection of the tariff filing and left open the possibility of a refiling with cost justification data by AT&T. (At 1235-1236)
 
 
 121
 On rehearing, although our discontent with the Commission's actions remains, we think upon further reflection that the Papago and Southern Railway cases preclude us from reviewing the FCC order. Both these decisions, in which courts declined to review agency orders regarding acceptance of rate revisions, might be distinguished as involving agency procedures less summary than those employed by the FCC here. The Papago customers had the protection of (1) cost justification data, (2) suspension of the increased rates, (3) an ordered hearing on the merits of the rate increase, and (4) a refund order of the full overcharge if rate increases were found unlawful. Papago, at 240-241. In Southern Railway, although there was no suspension or ordered hearing, the customers had the protection of (1) cost justification data, (2) ICC orders requiring the Railroad to document the effects of the rate changes, and (3) agency monitoring of the Railroad's financial condition. 442 U.S. at 449-50, 99 S.Ct. at 2391-92. The AT&T customers had none of these protections. Their only resort is to the complaint procedure of the Communications Act. (47 U.S.C. §§ 206-209) Under both Papago and Southern Railway, however, this remedy alone suffices to render the FCC order non-final and unreviewable. The factual differences between those cases and this case are differences without a distinction.
 
 
 122
 Judgment in accordance with this opinion.
 
 
 
 [1]
 In the Matter of American Telephone & Telegraph Co., et al. (F.C.C. Docket No. 18128): 61 F.C.C.2d 587 (1976); 42 Fed.Reg. 8178 (1977); 64 F.C.C.2d 971 (1977); 65 F.C.C.2d 621 (1977); 67 F.C.C.2d 1441 (1978). In the Matter of American Telephone & Telegraph Co. (Transmittal No. 12714): 64 F.C.C.2d 958 (1977); 64 F.C.C.2d 959 (1977); 65 F.C.C.2d 7 (1977)
 
 
 [2]
 For a detailed description of TELPAK and how is works, see American Trucking Associations, Inc. v. F.C.C., 126 U.S.App.D.C. 236, 239-42, 377 F.2d 121, 124-27 (1966), cert. denied, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967)
 
 
 [3]
 For a description of voice-grade channels, see id. at 240-41, 377 F.2d at 125-26
 
 
 [4]
 TELPAK, 37 F.C.C. 1111 (1964)
 
 
 [5]
 Once these ratemaking principles were established, it was intended that it would be determined whether TELPAK was compensatory
 Phase 1-A of the investigation related to AT&T's then current interstate rate of return and interstate rate base, see 9 F.C.C.2d 30, 9 F.C.C.2d 960 (1967), but is of no further interest to us here.
 
 
 [6]
 The measurement of long-run incremental costs (LRIC) involves computing all directly attributable investment and expenses incurred for the purpose of furnishing a particular service, including any additional common costs. Fully distributed costs (FDC) include not only the directly attributable costs, but also an allocation of costs which are inherently unattributable to any service
 
 
 [7]
 18 F.C.C.2d 761, 764 (1969)
 
 
 [8]
 Id. at 764-65
 
 
 [9]
 The seven methods evolved over the years, with "Method 1" appearing in 1965. The later developed allocation methods, exemplified by Method 7, were designed to distribute costs more on the basis of historic cost responsibility. The earlier methods, exemplified by Method 1, were designed to distribute costs more on the basis of relative use. See 61 F.C.C.2d at 642-44
 
 
 [10]
 In the Final Decision, the Commission had indicated that the issues in Docket 18128 had been narrowed so as to exclude the issues of specific rates. 61 F.C.C.2d at 596 & n. 36; Rulings on Exceptions, 42 Fed.Reg. 8178, 8199 (1977) (Rlgs. on UPI Excpt. 1-4, AP Excpt. 9)
 
 
 [11]
 This court has subsequently denied a motion requesting that AT&T be required to offer Telpak under the terms and conditions of unlimited resale and sharing (Order, August 18, 1977) and denied a motion seeking the expansion of the Telpak offering to new customers (Order, April 11, 1978)
 
 
 [12]
 This court's jurisdiction to review the FCC's Order prescribing fully distributed costs as the relevant standard for ratemaking (FDC Order) is invoked pursuant to section 402(a) of the Communications Act, 47 U.S.C. § 402(a) (1976), and 28 U.S.C. § 2342 (1976). The FDC Order is final for purposes of judicial review for several reasons. The denial by the FCC of the petitions for reconsideration of its FDC Order (64 F.C.C.2d 971) constitutes exhaustion of the administrative remedies available under 47 U.S.C. § 405 (1976). Although the FDC Order was issued pursuant to the FCC's statutory mandate under 47 U.S.C. §§ 201(b), 205 (1976) to prescribe "just and reasonable" rates (64 F.C.C.2d at 972), this not the type of order which must be challenged pursuant to the mandatory complaint procedures of 47 U.S.C. §§ 206-209 (1976) prior to judicial review. As discussed infra at page 24, et seq., the mandatory complaint procedure is appropriate when damages for allegedly illegal rate levels are being sought. The cost standard inquiry at issue here, on the other hand, "is not primarily a typical 'rate case' designed to test the lawfulness of specific charges ...." (64 F.C.C.2d at 972) In prescribing fully distributed costs and rejecting long run incremental costs as the relevant standard for ratemaking, the FCC was engaged in rulemaking. As the FCC admitted, "the purpose and effect of this proceeding is to establish basic principles and standards of general applicability for determining cost of service and corresponding rate levels, by service category." (64 F.C.C.2d at 972). The question now is whether the FCC Order was the product of arbitrary and capricious action, not whether a rate is just and reasonable
 Moreover, because this court holds in this case that TELPAK users must first pursue statutory complaint procedures to test the legality of the new rates (see page 1234, et seq., infra), common sense suggests that this is the appropriate time for judicial review of the validity of the relevant standard for assessing the legality of the rates. Postponement of judicial review of the FDC Order until after the final order regarding the legality of the new rates would be to place the cart before the horse.
 
 
 [13]
 This court had underscored the importance of the factor of competition in its order requiring the expeditious resolution of Docket No. 18,128:
 (T)he very reason for the Commission's 1965 rate investigation into AT&T's rates was the seven-way cost study which showed wide variations among the returns earned by AT&T's investment in monopoly and competitive service.
 Nader v. FCC, 172 U.S.App.D.C. 1, 25, 520 F.2d 182, 206 (1975). See also, id. at 29-30, 520 F.2d at 210-11 (Fahy, J., dissenting).
 
 
 [14]
 The theoretical benefits of LRIC pricing described in Judge Wilkey's separate opinion were also explored by the Supreme Court in American Commercial Lines v. Louisville & Nashville R. Co., 392 U.S. 571, 88 S.Ct. 2105, 20 L.Ed.2d 1289 (1968). As the Court stated there, the courts are "not particularly suited to pass on the merits of the(se) economic arguments . . . ." Id. at 586 n.16, 88 S.Ct. at 2113 n.16. In light of Judge Wilkey's separate opinion, however, one or two observations may be in order
 LRIC pricing has been developed only recently, primarily as a theoretical construct. To the extent it has been applied to regulated industries, it apparently has been confined to the monopolized markets for which it was originally devised. See Docket 18,128, 61 F.C.C.2d at 622 (quoting Recommended Decision). Indeed, considerable controversy remains as to whether LRIC pricing is either appropriate or capable of being administered in the far more complex and less well-understood regulatory environment of a mixed monopoly and competitive enterprise. Id. at 623-26. Thus, while the Commission's Opinion demonstrates a general sensitivity to the theoretical benefits of marginal cost pricing (of which LRIC is one species), it is tempered by the recognition that many of the conditions favoring such pricing in a mixed monopoly/competitive environment have not yet been clearly demonstrated. Id.
 In his separate opinion, Judge Wilkey nevertheless argues that the Commission's action cannot be upheld because it relies on "some fundamentally unsound economics." Opinion of Wilkey, J., at 2. As we understand his opinion, Judge Wilkey maintains that the Commission irrationally assumed that LRIC pricing automatically results in the addition of extra, fixed costs on monopoly customers, and that therefore the Commission rejected LRIC pricing without fairly considering its pro-competitive advantage. Id. at 8. We would not agree. The passages from the Commission's Opinion cited by Judge Wilkey can fairly be read simply as a recognition that when common or joint unattributable costs are carried solely by a company's monopoly customers, those customers are called upon to carry a more onerous burden than all others. This, in the Commission's terminology, may result in "cross-subsidization," see, e. g., 61 F.C.C.2d at 652, giving monopolists capable of loading their fixed costs entirely on monopoly customers a special advantage when they enter competitive markets. So read, in our view it was a matter for the Commission, in its discretion, to determine whether this aspect of LRIC pricing in mixed economic environments poses a serious drawback.
 
 
 [15]
 See Greater Boston Television Corp. v. FCC, supra
 
 
 [16]
 J.A. 932
 
 
 [17]
 J.A. 924
 
 
 [18]
 A service terminal is used to terminate private line channels at the telephone company central office serving the customer's premises
 
 
 [19]
 61 F.C.C.2d at 651-52
 
 
 [20]
 61 F.C.C.2d at 652
 
 
 [21]
 Free or Reduced Rate Interconnection Service for Non-Commercial Educational Broadcasting, 31 F.C.C.2d 496 (1971)
 
 
 [22]
 See American Telephone & Telegraph Co. v. FCC, 487 F.2d 865 (2d Cir. 1973)
 
 
 [23]
 44 F.C.C.2d 525, 527-29 (1973)
 
 
 [24]
 Other examples appear in Brief for Petitioner AT&T at 43. As far as the court is able to ascertain, no party (including the Commission), either in a brief or at oral argument, has attempted to defend the agency's action with respect to this issue
 
 
 [25]
 Restricted Rulemaking Proceedings, 47 F.C.C.2d 1183, 1184 n.9 (1974)
 
 
 [26]
 See Joint and Several Brief for Aeronautical Radio, Inc., Air Transport Ass'n of America, American Airlines, Inc. and Eastern Air Lines, Inc. filed Sept. 3, 1965 in D.C.Cir. Docket No. 19,466, at 23-29
 
 
 [27]
 American Trucking Associations, Inc. v. FCC, 126 U.S.App.D.C. 236, 248, 377 F.2d 121, 133 (1966), cert. denied, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967) ("Examination of this record satisfies us that the Commission complied with all procedural requirements")
 
 
 [28]
 Other courts have addressed the underlying issue. See Wilson & Co. v. United States, 335 F.2d 788, 796-97 (7th Cir. 1964); remanded for consent settlement, 382 U.S. 454, 86 S.Ct. 643, 15 L.Ed.2d 523 (1966); American Tel. & Tel. Co. v. FCC, 449 F.2d 439, 453-55 (2d Cir. 1971)
 
 
 [29]
 Such data must include a cost of service study for all elements of cost for the most recent 12-month period and a projection of costs for a three-year period beginning at the date of the filing of the tariff matter. 47 C.F.R. § 61.38(a)(2)(i). Also, the carrier must submit estimates of the effects of the tariff change on the carrier's traffic and revenues for the prior year and the succeeding three years. Id., § 61.38(a)(2)(ii). Finally, for tariff changes embodying rate increases of the magnitude proposed by AT&T, all cost, marketing, and other data relied on to justify the change must be filed. Id., § 61.38(d)
 
 
 [30]
 See, e.g., Asphalt Roofing Mfg. Assoc. v. ICC, 186 U.S.App.D.C. 1, 8, 567 F.2d 994, 1001 (1977); Texas Gas Corp. v. FPC, 102 U.S.App.D.C. 59, 61, 250 F.2d 27, 29 (1957)
 
 
 [31]
 Section 205(d) of the Federal Power Act, 16 U.S.C § 824d(d) (1976) is comparable to the notice provisions of the Communications Act, 47 C.F.R. § 61.58 (1977)
 
 
 [32]
 The court in Papago also observed that "(w)e are not concerned in this case with orders that accept tariff filings and allow them to take effect without investigation or refund obligation. Such orders would present different questions of reviewability." (At 238 n.8) For the reasons discussed above and in the Opinion on Petition for Rehearing, we nevertheless consider the Papago decision to be applicable to the facts of this case
 
 
 [33]
 See, e.g., Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970)
 
 
 [34]
 47 U.S.C. §§ 206-209 (1976). Under these provisions protestants may seek actual damages if they believe rates are unlawfully high. Here, as in Southern Railway, the complaint procedure shifts the burden of proof onto the aggrieved party and may restrict his ultimate relief to actual damages rather than to the full overcharge that would have been available had the FCC ordered an investigation. Id. As the Court noted in Southern Railway, however, neither of these two determinations "necessarily affects any citizen's ultimate rights" so as to permit judicial review. 442 U.S. at 454-455 & n.8, 99 S.Ct. at 2394, (footnote omitted)
 The complaint procedures of the Communications Act are a realistic remedy for TELPAK customers. Because we find TELPAK to be a discount bulk rate offering (slip op. at 23-24) customers can allege that the remaining private line rates are unlawfully high. We need not concern ourselves with the Commission's possible lack of power to mandate reinstitution of a service.
 
 
 [35]
 See Amendment of Part 61, 25 F.C.C.2d 957, 970-71 (1970); Part 0 Commission Organization, 57 F.C.C.2d 1122, 1123 (1976); Amendment of Parts 0, 1 and 61, 62 F.C.C.2d 474, 476 (1976)
 
 
 [36]
 See note 6 supra. Furthermore, the Court in Papago asserted that Southern Railway and Arrow Transportation show that "a nonfinal administrative order may be unreviewable even though it might result in serious irreparable injury to a party if immediate judicial review would undermine the authority of the agency acting within the scope of its discretion." (628 F.2d at 243) (Emphasis added)
 
 
 [1]
 61 F.C.C.2d 587 (1976)
 
 
 [2]
 See Permian Basin Area Rate Cases, 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1968), cited in Maj. Op. at 1228
 
 
 [3]
 Id. (citations omitted)
 
 
 [4]
 See Brief for Petitioner AT&T at 13, 44-45; Reply Brief for Petitioner AT& T at 16-23
 
 
 [5]
 See Brief for Respondent United States of America at 32-40
 
 
 [6]
 47 U.S.C. § 201(b) (1976)
 
 
 [7]
 Id. § 202(a)
 
 
 [8]
 See, e. g., I A. KAHN, THE ECONOMICS OF REGULATION 20 (1970); In re American Tel. & Tel. Co., 61 F.C.C.2d at 77 (quoting Recommended Decision)
 
 
 [9]
 See, e. g., F. SCHERER, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE 273-74 (1970)
 
 
 [10]
 Brief for FCC at 48
 
 
 [11]
 See In re American Tel. & Tel. Co., 61 F.C.C.2d at 612
 
 
 [12]
 See id. at 616
 
 
 [13]
 See id. at 618-19 (quoting Recommended Decision)
 
 
 [14]
 See id. at 607
 
 
 [15]
 See id. at 619 (quoting Recommended Decision)
 
 
 [16]
 See I A. KAHN, supra note 8, at 77-79
 
 
 [17]
 See In re American Tel. & Tel. Co., 61 F.C.C.2d at 619-26
 
 
 [18]
 Id. at 624
 
 
 [19]
 See id. at 652
 
 
 [20]
 Id
 
 
 [21]
 Id. at 669
 
 
 [22]
 Brief for FCC at 53
 22a ". . . it was a matter for the Commission, in its discretion, to determine whether this aspect of LRIC pricing in mixed economic environments poses a serious drawback." Maj. op. at 1229 n.13. Contrary to the majority's attempted evasion of hard economic analysis, the FCC's assumption, as evidenced in the quoted passages above and throughout the FCC opinion, is the key to the economic errors on which the decision is founded.
 
 
 [23]
 See In re American Tel. & Tel. Co., 61 F.C.C.2d at 610
 
 
 [24]
 See generally P. SAMUELSON, ECONOMICS 381-83 (1976)
 
 
 [25]
 I A. KAHN, supra note 8, at 159 (emphasis in original)
 
 
 [26]
 Id. at 162
 
 
 [27]
 See generally id. at 63-86. See also In re American Tel. & Tel. Co., 61 F.C.C.2d at 670-71 (Hooks, Comm'r, dissenting) (citing authorities)
 
 
 [28]
 Alchian says: "The general rule is simple: To minimize the costs of any specified amount of X, produce it with the lowest marginal costs. . . . In brief, producers should produce amounts that equate their marginal costs (or comes as near as possible to equating them.). That will result in no waste that is, in minimum cost." A. ALCHIAN, EXCHANGE AND PRODUCTION 172-77 (1977)
 Samuelson says: "Our analysis has demonstrated the following remarkable truth: Only when prices of goods are equal to Marginal Costs is the economy squeezing from its scarce resources and limited technical knowledge the maximum of outputs. Only when each source of industry output has had its rising MC (marginal cost) equated to any other source's MC as will be the case when each MC has been set equal to the common P (price) can the industry be producing its total Q (quantity) at minimum Total Cost. Only then will society be out on its production-possibility frontier and not efficiently inside the frontier. This equal-marginal-cost dictum is as applicable to a communist, socialist, or fascist society as to a capitalistic society." P. SAMUELSON, supra note 24, at 462 (emphasis in original).
 
 
 [29]
 "These are the rules that most authorities have adopted, and with which we concur. One implies the other; as long as the favored customers pay their full additional costs, the others cannot on this account be led to pay more than the costs of serving them in the absence of discrimination. And both together imply the condition that discrimination be permitted only as long as it imposes no burden on the customers being discriminated against. Such a rule would prohibit internal subsidization." I A. KAHN, supra note 8, at 142-43 (emphasis in original). See also id. at 142 n.37, and sources cited therein
 
 
 [30]
 P. SAMUELSON, supra note 24, at 498 (emphasis in original)
 
 
 [31]
 See I A. KAHN, supra note 8, at 159-75
 
 
 [32]
 Id. at 160-61
 
 
 [33]
 See id. at 166-70
 
 
 [34]
 See, e. g., In re American Tel. & Tel. Co., 61 F.C.C.2d at 636 n.80
 
 
 [35]
 See id. at 621-24
 
 
 [36]
 See I A. KAHN, supra note 8, at 75, 143-44
 
 
 [37]
 See In re American Tel. & Tel. Co., 61 F.C.C.2d at 614, 626-27, 629, 639
 
 
 [38]
 See I A. KAHN, supra note 8, at 140-44
 
 
 [39]
 See In re American Tel. & Tel. Co., 61 F.C.C.2d at 642
 
 
 [40]
 See id. at 640
 
 
 [41]
 See id. at 636 n.80
 
 
 [42]
 See Brief for FCC at 30, 50, 54; In re American Tel. & Tel. Co., 61 F.C.C.2d at 610-12
 
 
 [43]
 In re American Tel. & Tel. Co., 61 F.C.C.2d at 632
 
 
 [44]
 See Brief for FCC at 53
 
 
 [45]
 See In re American Tel. & Tel. Co., 61 F.C.C.2d at 590
 
 
 [46]
 Id. (emphasis in original)
 
 
 [47]
 See id. at 592
 
 
 [48]
 Id. at 641
 
 
 [49]
 Reply Brief for Respondent United States of America at 9 n.10
 
 
 [50]
 See Specialized Common Carrier Services, 29 F.C.C.2d 870, 915 (1971)
 50a For example, in American Commercial Lines, Inc. v. Louisville & N.R.R., 392 U.S. 571, 88 S.Ct. 2105, 20 L.Ed.2d 1289 (1968), the Supreme Court stated in dictum that it was reluctant to pass on the merits of marginal cost economic arguments. Id. at 586 n.16, 88 S.Ct. at 2113 n.16. But the Court added at the end of this footnote: "Our discussion here should not be interpreted as a rejection of the basic economic points made by the railroads. It is merely intended to illustrate the desirability of having the initial resolution of these issues made by a tribunal, and in a proceeding, more suitable than the present one." Id. at 589 n.16, 88 S.Ct. at 2114 n.16 (emphasis added).
 
 
 [51]
 Brief for Respondent United States of America at 35 (emphasis in original) (citations deleted). See also In re American Tel. & Tel. Co., 64 F.C.C.2d at 978 & nn.13-14 (1977) (on petitions for reconsideration)
 
 
 [52]
 A simple example, in a situation familiar to judges, lawyers, law teachers, and even law students, will make clear the above economic exposition, even if the reader has no background in economics whatsoever. This example will illustrate the fundamental difference between these two cost and pricing concepts, and show the basic fairness and ultimate economic utility of long-range incremental cost pricing
 Suppose that Judge X is called by the moot court board at Anywhere Law School and invited to come to Anywhere and sit as a judge in the moot court finals. The board representative states that all of Judge X's actual out-of-pocket expenses will be paid. Judge X, interested in giving a pleasant outing to his wife, inquires if the invitation, all expenses paid, includes Mrs. X in the hospitality. The person in charge replies, "I am sure that Mrs. X would be very welcome, and we'll be glad to make any arrangements for her at the hotel, but at the moment I can't say whether the moot court board is in a position to pick up her expenses at the hotel." Judge X replies, "I would like to bring Mrs. X anyway, so please make the reservations for her and we'll see later where the expense is to be charged."
 Judge and Mrs. X attend the moot court, the bill at the hotel for the two is $150 a day, full American plan, and Judge X carefully notes that it would have been $125 a day for him alone. On return he sends in his itemized statement of expenses and notes that the question of whether the moot court board is picking up the expenses of Mrs. X had not been resolved if they are, he should be reimbursed at $150 a day; if not, he should be reimbursed at $125 a day.
 The moot court board replies, saying that they are very sorry but they cannot pick up the hotel expenses of Mrs. X and that they are enclosing a reimbursement for Judge X's expenses calculated on a basis of $75 a day. Judge X doesn't understand this. If he had gone alone, it is very clear that he would have been reimbursed at $125 a day for himself alone, because this is what the charge for the room, full American plan, plainly was. The added increment for Mrs. X was only $25 a day at the most. It is clear that the moot court board would have had to pay $125 a day for Judge X alone, and this was their original invitation on this basis.
 The moot court board replies, "Judge X, you don't understand fully distributed costs. It's obvious that the facilities at the hotel, including room and meals and all services, were enjoyed equally by you and Mrs. X. One half of $150 a day is $75 a day, which is the cost properly allocated to you alone. It is true that if you had come by yourself, the cost would have been $125 a day, and we would have reimbursed you on that basis, but you didn't come alone, you added another pleasurable increment to your visit here, namely, the company of Mrs. X, and that part is properly chargeable to Mrs. X and you, and not to the moot court board. We believe in the economics of fully distributed costs, and fully distributed costs means $75 allocated to Mrs. X and $75 allocated to Judge X. We are paying only for Judge X.
 Judge X further protests, "If I had known you were going to charge on this basis, I would never have brought Mrs. X at $75 a day. I would have come by myself at the agreed all-expense rate, payable at $125 a day for me, and never brought Mrs. X into the picture. If there is anything I'm clear about, it's the unfairness of this retroactive application of your theory on costs. You did say it was undecided whether you could pay for Mrs. X or not, but you never said that you were going to charge for my expenses on a different basis if I brought Mrs. X. This retroactive application is the most unfair thing of all."
 The moot court board replies, "If there is anything clear from our point of view, it is that you were on full notice that we might or not pay Mrs. X's expenses, and if we couldn't pay Mrs. X's expenses, surely you must realize that we were at liberty to use the logical method of fully distributed costs in calculating the expense properly chargeable to you and to her. The fact that we made up our minds later as to whose expenses to pay and by which method to calculate the costs is immaterial. You were on full notice of this all along."
 The parallel with the AT&T situation is obvious. The cost for monopoly services is fixed, and will be the same whether the competitive services are added by AT&T or not. The cost for the monopoly services is the equivalent of the $125 which would have been the hotel charge for Judge X; the cost for the competitive services would be the additional $25 which would be added if Mrs. X enjoyed the use of the same services. From the hotel's point of view, the additional cost for Mrs. X's presence is only the additional linens and the food, and therefore the incremental cost for her presence is a relatively small amount compared to the basic cost of providing that one room and facilities for one person. (The hotel might calculate that the presence of Mrs. X would generate sales in the shops on the hotel premises and thus add a small amount to hotel revenues, and thus the hotel could encourage her presence by charging even less than the cost of the linens and food and still make a profit on the incremental services. Similar comparisons might be made to AT&T services.)
 To apply fully distributed costs to the stay of the couple at the hotel is economic nonsense; it is unquestionably true that considered ab initio the cost of providing the room and food for the two persons can be divided equally, $75 apiece, but this bears no relation to the economic logic of the way to conduct a hotel business or to conduct a moot court board's business either. What the moot court board was faced with from the start was paying the total expenses of Judge X, which amounted to $125 at the price charged by the hotel. Similarly, the price charged by the hotel for Judge X individually was what it cost to put one person in the room and provide meals and all services, with a reasonable profit.
 Both the hotel and the moot court board should logically and sensibly run their business on an incremental cost basis, just as is advocated by AT&T and the Antitrust Division in our case. The basic cost of having Judge X come to the moot court is going to be $125 a day whether Mrs. X comes or not. The board is logically forced to pay this price. The advent of Mrs. X is something entirely within the control of Judge X; she can come or not, and if she does come, there is no moral or economic right of the moot court board to profit by the incremental service the hotel is providing for Mrs. X by reducing the cost allocated to Judge X's presence, which logically still remains at $125 a day and is not either economically or equitably reducible to $75.
 Similarly, the charges which the monopoly customers of AT&T have been paying and which have been previously determined as fair, based on the costs of AT&T in providing these services, should not necessarily be reduced simply because AT&T can inaugurate other services in the competitive market. The costs properly allocated to the new competitive services of AT&T are incremental costs, not fully distributed costs, because the costs of the monopoly services should remain the same irrespective of whether AT&T enters competitive markets or not. (Actually, as shown by the detailed economic exposition above, there is hope that the competitive services of AT&T, with incremental cost pricing, will definitely contribute to a lowering of costs for the monopoly service customers.)
 Of course, as Judge X would probably indignantly point out in our hypothetical case, the retroactive determination by the moot court board to reimburse him on the basis of fully distributed costs, i. e., only $75 for his half of the hotel room and services, is the most unfair and illogical action of all. While Judge X did understand that the moot court board might or might not pay for Mrs. X, he doubtless thought that surely the question of the cost of his own visit was fully settled, and would not be affected by whether the incremental cost of Mrs. X was added. This compares with AT&T knowing that the whole question of an ultimate costing was yet to be decided, but surely AT&T should not be penalized retroactively on a fully distributed cost theory, when the cost of its monopoly services would have remained the same over the years, whether AT&T had added the incremental services or not.